IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

              Respondent,                 No. CR S-99-0043 WBS EFB

    vs.

THOMAS RAYMOND ROSS,

              Movant.              __FINDINGS AND RECOMMENDATIONS__

_____/

       Movant, Ross, is a federal prisoner proceeding pro se with a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[1] He seeks post-conviction relief on the grounds that: (1) his trial counsel rendered ineffective assistance; (2) his conviction was obtained by the use of a coerced confession; (3) his conviction was based on statements obtained in violation of _Miranda v. Arizona_, 384 U.S. 436 (1966); (4) prosecutorial misconduct violated his right to a fair trial; and (5) his sentence was based on improper application of the Federal Sentencing Guidelines. The court has carefully considered the record and the applicable law, and for the reasons set forth below finds that the section 2255 motion must be denied.

////

---

[1] This motion was assigned, for statistical purposes, the following civil case number: No. CIV S-05-0167 WBS EFB P.

1

**I. Background**

On February 5, 1999, the grand jury returned a six count indictment charging movant with one count of conspiring to manufacture methamphetamine.  Dckt. No. 17.  Movant was represented by attorney Robert Holley until September 29, 1999, at which time attorney Malik Ali Muhammad substituted in place of Mr. Holley as movant's retained counsel.  Dckt. Nos. 79, 81.  On January 14, 2000, after movant's three co-defendants pled guilty, a three-count superseding indictment was filed charging movant with conspiring to manufacture methamphetamine (Count One); conspiring to distribute pseudoephedrine with knowledge or reasonable cause to believe that it would be used to manufacture a controlled substance (Count Two); and distributing pseudoephedrine with knowledge or reasonable cause to believe that it would be used to manufacture a controlled substance (Count Three).  Dckt. No. 103.

Trial commenced on February 8, 2000, Dckt. No. 115, and on February 14, 2000, the jury found movant guilty on all counts.  Dckt. No. 130.  When attorney Muhammad failed to appear for movant's June 14, 2000 sentencing proceedings, the court appointed attorney Donald S. Frick to represent movant.  Dckt. No. 145.  Movant subsequently learned that attorney Muhammad had been suspended from practice by the California state bar shortly before the start of his trial. Dckt. No. 147.[2]

Movant filed a motion for new trial, arguing that he received ineffective assistance of counsel because his trial attorney was not entitled to practice law during the trial, Dckt. No. 147, and that motion was denied.  Dckt. No. 153.  He then filed a motion for reconsideration, which was also denied.  Dckt. No. 167.  On April 11, 2001, movant was sentenced to a term of 240 months in prison and 36 months of supervised release.  Dckt. No. 172.  On April 26, 2001, the trial court amended movant's sentence to a term of 240 months in prison and 60 months of

---

[2]  Muhammad was placed on disciplinary suspension by the California state bar on December 19, 1999, and was later disbarred.  The suspension was apparently based on Muhammad's failure "to attend ethics school or take a professional responsibility examination." Movant's "Reply to Government's Response" (hereafter "Reply"), at 6.

2

1  supervised release.  Dckt. No. 176.

2       On April 26, 2001, movant filed a timely notice of appeal.  Dckt. No. 175.  In a published

3  opinion, the Court of Appeals for the Ninth Circuit affirmed the judgment of conviction in its

4  entirety.  *United States v. Ross*, 338 F.3d 1054, 1055 -1056 (9th Cir. 2003) (*per curium*).  The

5  instant motion, seeking relief pursuant to 28 U.S.C. § 2255, was filed on January 22, 2005.

6  **II.  Factual Background**

7       Alza Corporation (hereinafter "Alza") is a company that manufactured antihistamine pills

8  and in doing so used large quantities of pseudoephedrine.  Movant, Ross, worked for Alza as its

9  senior hazardous material technician.  This gave him access to pseudoephedrine that had been

10  designated as waste, which was to be stored until transported to a special disposal place.

11  Reporter's Transcript ("R.T.") 26-27.  Alza discovered that a drum of such pseudoephedrine had

12  been stolen.  It investigated and learned that movant was stealing it and selling it to persons who

13  used it to illegally manufactured methamphetamine.  This lead to movant's prosecution and

14  ultimate conviction in the instant case.

15       The following factual summary is drawn from respondent's opposition to the § 2255

16  motion, at 3-10, and is reproduced here solely to provide a factual background with respect to

17  movant's claims.  Where movant challenges these facts in connection with any particular claim,

18  that challenge is noted in the body of these findings and recommendation.

19       Once designated as waste, this pseudoephedrine would go into Alza's waste
20       handling system.  R.T. 27.

     In 1998, the [movant] was a senior hazardous material technician for Alza.  R.T.
21       25.  In that position, he had total access to Alza's hazardous waste area where the
     pseudoephedrine designated as waste would be stored until it was transported to a
22       special disposal place.  R.T. 25-27.  In 1998, Alza did not keep track of
     pseudoephedrine waste once it reached the hazardous waste area.  R.T. 28-29.
23       Once the pseudoephedrine waste was taken to the hazardous waste area, Alza
     simply depended on employees like the [movant] to ensure that it was taken to a
24       proper disposal site.  R.T. 28.

25       In June, 1998, Alza discovered that a drum of pseudoephedrine tablets had been
     stolen and began an investigation into this theft.  R.T. 2-3, 23.  On July 16, 1998,
26       Alza's manager of corporate security, Mervin Marty, interviewed the [movant].

R.T. 3.  During this interview, the [movant] denied any involvement in the pseudoephedrine theft.  R.T. 4.  He acknowledged to Mr. Marty, however, that pseudoephedrine was the key ingredient for making methamphetamine.  R.T. 4-5.  The [movant] further stated that he knew that there were a lot of methamphetamine laboratories in the area.  R.T. 5.

When Alza became aware that pseudeoephedrine was being stolen from its premises, it hired a private investigation firm, Confidential Management Services ("C.M.S."), to assist in an investigation.  R.T. 23-24.  As part of this investigation, Michael Lawlor, a C.M.S. investigator, posed in an undercover capacity as an employee of Alza between approximately, early July, 1998, and February, 1999.  R.T. 354-355.

On November 10, 1998, Mr. Lawlor met with the [movant].  R.T. 355-356.  Gabe Raya, an Alza employee who was working as a confidential informant for management, introduced Mr. Lawlor to the [movant] and participated in their meeting.  R.T. 356-357.  At this meeting, Mr. Raya indicated that if they supplied the [movant] pseudoephedrine, they could make some extra money.  R.T. 358-360.  Mr. Raya elaborated as to how they mark, then deliver barrels of pseudoephedrine to the [movant].  R.T. 360.

At this point in their conversation, the [movant] stated that if Lawlor and Raya could get him barrels of pseudoephedrine, the three men would split between $5,000 to $7,000 per barrel.  R.T. 360-361.  The [movant] then said that he wanted the 55-gallon barrels of pseudoephedrine marked with the numbers "123" on their labels.  R.T. 361.  The [movant] then stated that Raya would ensure that the barrels of pseudoephedrine would be moved to the appropriate location.  R.T. 361.  The [movant] then went back to work.  R.T. 362.

In December, 1998, some barrels of pseudoephedrine were stolen fro Alza.[3]  Alza did not know who had stolen them.  R.T. 114.  Peyton Schur, the chairman of C.M.S., posed in an undercover capacity as one of the thieves of this pseudoephedrine and had a telephone conversation with the [movant].  R.T. 107-108, 114, 130-132, 136-137.  During this conversation, the [movant] stated that he and another person had been involved with stealing pseudoephedrine from Alza in the past.  R.T. 113, 137-139.

On December 15, 1998, representatives of C.M.S. questioned the [movant].  R.T. 34-35, 116.  During this interview, the [movant] denied ever stealing any pseudoephedrine from Alza.  R.T. 36, 116.  He did admit that he had told other Alza employees that he was involved in stealing pseudoephedrine in an unsuccessful effort to ascertain the identities of the real thieves.  R.T. 36-37.

On December 18, 1998, representatives of C.M.S. again interviewed the [movant].  R.T. 48-50, 116-120.  A portion of this interview was tape recorded.

---

[3] The [movant] did not steal this pseudoephedrine.

4

R.T. 51-54; Govt. Exh. 3-B, 3-D.[4]  The [movant] also completed a written statement.  R.T. 51-52, 55; Govt. Exh. 3-C.

In this interview, the [movant] stated that he had not been truthful before and admitted that he had in fact stolen pseudoephedrine from Alza on two occasions. Govt. Exhs. 3-B, 3-C, 3-D; R.T. 553.  The first occasion occurred in approximately September or October he [sic] stole some 30 gallon drums of pseudoephedrine which he and another individual delivered to Derrick Williams. Govt. Exhs. 3-B, 3-C, 3-D.  The [movant] stated that Williams gave him $5,000 for his efforts.  Govt. Exhs. 3-B, 3-C, 3-D.  The second theft occurred around November when the [movant] delivered a small amount of pseudoephedrine to Williams, who paid him $750.  Govt. Exhs. 3-B, 3-C, 3-D.  The [movant] said that he stole this pseudoephedrine from Alza because Williams had threatened to harm him and his son if he did not cooperate with Williams.  Govt. Exhs. 3-B, 3-C, 3-D.

On December 21, 1998, the [movant] again met with a representative of C.M.S. and again admitted that he had stolen pseudoephedrine from Alza.  R.T. 55-57, 553-554; Govt. Exhs. 4-1, 4-B.

On December 22, 1998, Detective Nathan Benevides of the Vacaville Police Department conducted a videotaped interview of the [movant] regarding the Alza pseudoephedrine thefts.  R.T. 82-88; Govt. Exhs. 5-B, 5-C.  During this non-custodial interview, the [movant] initially admitted that he had helped steal pseudoephedrine from Alza on two occasions.  R.T. 82-83, 554-555; Govt. Exhs. 5-B, 5-C.  Later in the interview, the [movant]  admitted that he had stolen pseudoephedrine on three separate occasions.  R.T. 554-555; Govt. Exhs. 5-B, 5-C.

The [movant] told Detective Benevides that in approximately July, he had stolen four smaller barrels of pseudoephedrine from Alza and delivered them to Derrick Williams.  R.T. 554; Govt. Exhs. 5-B, 5-C.  In approximately September or October, he stold two large and one small drum of pseudoephedrine and delivered them to Williams.  R.T. 554-555; Govt. Exhs. 5-B, 5-C.  Finally, around November, he delivered to Williams yet another drum of Alza's pseudoephedrine. R.T. 554-555; Govt. Exhs. 5-B, 5-C.

When Detective Benevides asked the [movant] if he knew what the pseudoephedrine was being used for, the [movant] answered that Williams had told him that the Hell's Angels stripped it to make drugs with it.  Govt. Exhs. 5-B, 5-C.

Derrick Williams, testifying pursuant to a cooperation agreement with the government, described how he and the [movant] conspired to steal large quantities of pseudoephedrine from Alza which would then be provided to methamphetamine manufacturers.  R.T. 156-185.  He testified that the [movant] delivered pseudoephedrine tablets to him on three separate occasions for a total of six barrels of pseudoephedrine.  R.T. 181-182.

---

[4]  "Govt. Exh." refers to Government Exhibit.

Williams worked for Alza from March, 1992 to February, 1998, so he knew the [movant], and also knew that Alza produced pseudoephedrine products.  R.T. 157-158, 171.  Williams was a user of methamphetamine and had been told that pseudoephedrine was used to make methamphetamine.  R.T. 166.  In May, 1998, Williams approached the [movant] and asked him if he could get some pseudoephedrine.  R.T. 158.  The [movant] said that he would think about it.  R.T. 158.

About one month later, Williams recontacted the [movant].  R.T. 158.  At that time, the [movant] said that he had a few drums of pseudoephedrine that he could get for Williams.  R.T. 158.

About two or three weeks later, the [movant] delivered three 30-gallon barrels of pseudoephedrine tablets to Williams at a division of Alza called Alzette.  R.T. 159-160.  Williams later delivered most of these pseudoephedrine tablets to an individual named J.R. and gave a small portion of them to co-defendant Karen Brooks.  R.T. 160-161, 164-165.  J.R. paid Williams $20,000 for these tablets, and Williams paid the [movant] $10,000 for his assistance.  R.T. 160-161, 175-176.

Approximately one month later, after Williams had asked for more pseudoephedrine, the [movant] delivered two more drums of pseudoephedrine tablets to Williams at the [movant's] house.  R.T. 161-162.  Williams took these tablets to J.R.  R.T. 163.  Though J.R. claimed that these tablets were later stolen from him, he eventually paid Williams $7,000.  Williams gave the [movant] half of this money.  R.T. 163, 181.

The [movant] later provided Williams with another 30-gallon drum of pseudoephedrine tablets, and Williams gave him $4,000 for his services.  R.T. 181-182, 165-166.  Williams delivered this drum of pseudoephedrine to Karen Brooks.  R.T. 164-165.

Karen Brooks also testified pursuant to a cooperation agreement with the government.  She admitted that she was a methamphetamine addict.  R.T. 149.  She further testified that she knew Derrick Williams, who asked her in the fall of 1998 if she knew of anyone who might want to buy some pseudoephedrine.  R.T. 146-147.  Brooks asked around and learned that co-defendant Ronald Hardin was interested in obtaining pseudoephedrine.  R.T. 147.  With Brooks' assistance, Hardin purchased some pseudoephedrine from Williams.  R.T. 147-148.  Brooks received $1,000 and some methamphetamine for her services.  R.T. 148-149.

About one month later, with Brooks' assistance, Williams again sold Hardin some pseudoephedrine.  R.T. 149-151.  Brooks again received $1,000 and some methamphetamine.  R.T. 151.

////

////

////

During the course of their conversations, Williams told Brooks that he was getting the pseudoephedrine tablets from a person named Thomas.  Williams explained that he used to work at a chemical plant, and that Thomas still worked there.  R.T. 152.  Thomas would get pills from the plant that had been discarded as waste.  R.T. 152.  While Williams never identified his supplier's last name when talking to Brooks, he used the first name of Thomas several times.  R.T. 152.

Drug Enforcement Administration Special Agent Robert Edward Kittrell testified that one of the barrels that the [movant] removed from Alza, if used to manufacture methamphetamine, would produce approximately 25 to 30 pounds of methamphetamine.  R.T. 191, 182.  As the [movant] delivered pseudoephedrine to Williams on three occasions, totaling six barrels, those six barrels of pseudoephedrine were capable of producing between 150 and 180 pounds of methamphetamine.  R.T. 182, 191.

## III.  Applicable Law

Title 28 U.S.C. § 2255 provides, in part, as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

## IV.  Movant's Claims

### A.  Ineffective Assistance of Counsel

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a petitioner/movant must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 687-88.  After a petitioner/movant identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Second, a petitioner or movant must establish that he was prejudiced by counsel's deficient performance.

1   *Strickland*, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that,

2   but for counsel's unprofessional errors, the result of the proceeding would have been different."

3   *Id*. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

4   outcome."  *Id.  See also Williams v. Taylor*, 529 U.S. 362, 391-92 (2000); *Laboa v. Calderon*,

5   224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

6   performance was deficient before examining the prejudice suffered by the defendant as a result

7   of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the

8   ground of lack of sufficient prejudice . . . that course should be followed."  *Pizzuto v. Arave*, 280

9   F.3d 949, 955 (9th Cir. 2002), *concurring and dissenting opinion amended*, 385 F.3d 1247 (9th

10  Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).

11       In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption

12  that counsel's performance falls within the 'wide range of professional assistance.'"  *Kimmelman*

13  *v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).  There is in

14  addition a strong presumption that counsel "exercised acceptable professional judgment in all

15  significant decisions made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing

16  *Strickland*, 466 U.S. at 689).  However, that deference "is predicated on counsel's performance

17  of sufficient investigation and preparation to make reasonably informed, reasonably sound

18  judgments."  *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc).[5]

19       Movant raises numerous claims alleging ineffective assistance of trial counsel.  He also

20  claims his appellate counsel rendered ineffective assistance in failing to raise a claim of

21  prosecutorial misconduct on appeal.  Each of these claims, in turn, below is addressed below.

22  ////

---

23       [5]  For *Strickland* claims, it is unnecessary to conduct a harmless error analysis under

24  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), because "'[t]he *Strickland* prejudice analysis
    is complete in itself; there is no place for an additional harmless-error review.'"  *Avila v. Galaza*,

25  297 F.3d 911, 918 n.7 (9th Cir. 2002) (quoting *Jackson v. Calderon*, 211 F.3d 1148, 1154 n. 2
    (9th Cir. 2000)).

26

### 1. <u>Trial Counsel's Disbarment</u>

Movant's first claim is that attorney Muhammad's suspension from practice prior to the commencement of his trial constitutes ineffective assistance of counsel and should result in "per se reversal" of his conviction. Memorandum of Points and Authorities in Support of Motion (hereafter "P&A"), at 23-24.[6] This claim was rejected by the U.S. Court of Appeals for the Ninth Circuit on movant's direct appeal. In its published opinion, the appellate court held, among other things, that movant's representation by an attorney who was suspended from practice prior to the trial did not result in a per se denial of the Sixth Amendment right to the effective assistance of counsel, but that movant was required to demonstrate deficient performance and prejudice. *Ross*, 338 F.3d at 1056-57. This court is bound by the decision of the Court of Appeals in this regard. *See Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993) (under the doctrine of law of the case "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.") Accordingly, movant is not entitled to relief on this claim.

### 2. <u>Failure to Pursue Motion to Suppress</u>

Movant claims that attorney Muhammad rendered ineffective assistance by failing to pursue a motion to suppress his statements to the police and to employees of Alza and Confidential Management Services (CMS). P&A at 25-27. A motion to suppress these statements was filed by attorney Holley but was withdrawn by attorney Muhammad. Movant argues that the motion to suppress was meritorious and that suppression of his statements would have led to a different outcome at trial. With regard to the merits of the motion, he argues that: (1) his statements to CMS and Alza employees were the product of state action because those employees were acting at the direction of law enforcement authorities; (2) his statements to CMS and Alza employees were psychologically coerced through methods that caused his will to be

---

[6] This court will refer to page numbers of the parties' pleadings by using the automated numbers assigned by the court's electronic filing system.

1  overborne; (3) his statements to CMS and Alza employees were involuntary because they were

2  the product of physical assault and threats of "harm to his family, rearrest and loss of his job;"

3  and (4) his statements to CMS and Alza employees and to Detective Benevides of the Vacaville

4  Police Department were obtained in violation of his right to counsel.  *Id.* at 26-27.

5      The failure of trial counsel to file a motion to suppress may support a claim of ineffective

6  assistance of counsel.  *Kimmelman*, 477 U.S. at 383; *Moore v. Czerniak*, 574 F.3d 1092, 1101

7  -1102 (9th Cir. 2009).  In order to prevail on the deficient performance prong of *Strickland*, a

8  petitioner must demonstrate that his counsel's failure to file such a motion "fell below an

9  objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88.  In order to demonstrate

10  prejudice, a petitioner must also demonstrate that: (1) the motion is meritorious, and (2) the

11  verdict would have been different absent the excludable evidence.  *Kimmelman*, 477 U.S. at 375.

12  Because movant's claim involves trial counsel's failure to suppress a confession, the prejudice

13  question is also informed by *Arizona v. Fulminante*, 499 U.S. 279 (1991).  Under *Fulminante,*

14  the prejudice analysis must be conducted with an awareness that "a confession is like no other

15  evidence," and that "a full confession may have a 'profound impact' on the jury."  499 U.S. at

16  296.  A reviewing court must "exercise extreme caution" before determining that the failure to

17  move to suppress a coerced confession was not prejudicial.  *Id.  See also Moore*, 574 F.3d at

18  1101-03.

19          a.  **Deficient Performance**

20      Respondent argues that attorney Muhammad may have withdrawn the motion to suppress

21  in order to keep the Government "in the dark" about the nature of movant's testimony regarding

22  the coercive nature of his interrogations.  Response to § 2255 motion (hereafter "Response"), at

23  16-17.  He contends this tactical decision was reasonable.  *Id.*  Movant, on the other hand, argues

24  that the nature of his testimony on this subject was apparent from the pleadings.  He speculates

25  that Muhammad withdrew the motion because he wanted to "save himself work and to marshal

26  whatever monies were available for fees."  Reply at 8-9.  However, the court need not address

1  whether attorney Muhammad made a reasonable tactical decision to withdraw the motion to

2  suppress.  For the reasons set forth below, movant was not prejudiced by counsel's decision.

3  **b.  Merits of Motion – Movant's Statements to Alza/CMS Employees**

4  As described above in the factual background section, movant made a number of

5  incriminating statements to employees of Alza and/or CMS, the private investigation company

6  hired by Alza.  In the motion to suppress filed by attorney Holley, movant argued that these

7  statements were coerced and were obtained in violation of his right to counsel.  Dckt. No. 56.

8  He contended that all statements made by movant to these employees were the equivalent of

9  statements to the police because the employees were "being aided and encouraged by members

10  of law enforcement, merging their legal identities for purposes of the Fourth, Fifth and Sixth

11  Amendments to the United States Constitution." *Id.* at 4.  In support of this contention, movant

12  explained that during his interrogation by a CMS employee on December 18, 1998, he overheard

13  his interrogator make a telephone call to Detective Benevides, although he could not tell what

14  was being said. *Id.* at 3.  In addition, before he was released the CMS investigator and an Alza

15  security officer called Benevides and made an appointment for movant to be interviewed by the

16  Vacaville police. *Id.*

17  In *United States v. Attson*, 900 F.2d 1427, 1432 (9th Cir. 1990), the Ninth Circuit held

18  that "where a private party acts as an 'instrument or agent' of the state in effecting a search or

19  seizure, Fourth Amendment interests are implicated" (citing *United States v. Walther*, 652 F.2d

20  788 (9th Cir. 1981)).  On the other hand, where a private party "act[s] for a reason entirely

21  independent of the government's interest to collect evidence for use in [a] criminal prosecution,"

22  the Fourth Amendment does not apply. *Id.* at 1433.  The appellate court explained:

23      Determining whether the conduct of a non-law enforcement
        governmental party is subject to the Fourth Amendment presents a
24      question that is analytically quite similar to determining whether
        the conduct of a private party is subject to the Fourth Amendment.
25      Both of these analyses proceed from the premise that at its core the
        Fourth Amendment was designed to apply to the conduct of law
26      enforcement officials engaged in criminal investigations and that if

the application of the Fourth Amendment is to expand beyond that
core, the conduct to which it expands must approximate the types
of activities to which the amendment is primarily directed; in other
words, such conduct must be considered a "search" or "seizure." In
addition, both analyses require us to gauge whether the party
whose actions are challenged intended to assist the government in
activities ("searches or seizures") covered by the Fourth
Amendment, or whether his motivation was independent of such
considerations. . . We thus conclude that for the conduct of a
governmental party to be subject to the Fourth Amendment, the
governmental party engaging in that conduct must have acted with
the intent to assist the government in its investigatory or
administrative purposes and not for an independent purpose.

*Id.* at 1432-33. "The general *Attson* rule is that non-law enforcement government actors come

within the purview of the Fourth Amendment only when their searches or seizures of individuals

have *no other purpose* but to aid the government's investigatory or administrative functions."

*Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995) (emphasis added).

Here, employees of Alza and CMS were employed to determine whether employees were

stealing pseudoephedrine from Alza's premises and should be fired.  This reason was

independent from the police investigation, which was being conducted to obtain information for

use in a criminal prosecution.  Further, although movant declares that he overheard several

contacts between his non-police interrogators and Detective Benevides, neither of these contacts

proves that the private investigators were acting with the primary or exclusive intent to assist the

Vacaville police in its criminal probe.  Nor do these minimal contacts transform these private

investigators into agents of the state.

In its opposition to movant's motion to suppress, respondent submitted the declaration of

Detective Benevides.  Dckt. No. 59, Ex. 1.  Benevides declares that he knew Alza had hired a

private investigative company to determine whether any of its employees should be fired for

stealing pseudoephedrine.  *Id.* at ¶ 4.  He further declares that, while CMS shared new

information with him, he did not provide information to Alza or CMS and did not discuss

information with these entities unless they had previous knowledge of it.  *Id.* at ¶ 5.  He did not

suggest or request that CMS conduct any interviews of movant and he did not know when those

interviews were going to take place. *Id.* at ¶ 6. He did not offer suggestions or guidance to CMS

regarding interviews with movant, nor did he participate "in any way whatsoever." *Id.*

Although Benevides may have gotten a telephone call during one of the interviews being

conducted by Alza or CMS, he did not suggest any questions because he wanted to keep his

investigation separate from theirs. *Id.* at ¶ 7. Detective Benevides' declaration reflects that the

employees of Alza and CMS were not acting for the primary purpose of assisting him with his

criminal investigation. Rather, they were acting at the behest of Alza with the goal of identifying

employees who should be fired. Accordingly, movant's statements to Alza and CMS employees

are not protected by the federal constitution.[7]

### c.  Merits of Motion – Movant's Statements to Detective Benevides

The motion to suppress also argued that movant's statements to Detective Benevides

were obtained in violation of his right to counsel. Dckt. No. 56 at 12. Specifically, movant

stated that he asked Detective Benevides when he arrived at the police station whether he

"needed an attorney" and Benevides replied that, because he didn't "use" an attorney during his

interrogation by Alza/CMS employees, he didn't "need one here." *Id.* at 14.

The constitutional warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966) are

required only when a suspect is in custody. *Stansbury v. California*, 511 U.S. 318, 322 (1994);

*Stanley v. Schriro*, 598 F.3d 612, 618 (9th Cir. 2010). Similarly, the right to counsel cannot be

invoked before a defendant is in custody. *McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991).

The relevant inquiry underlying the question of custody "is simply whether there was a formal

arrest or restraint on freedom of movement of the degree associated with a formal arrest."

*Stansbury*, 511 U.S. at 322 (citation and alteration omitted). To answer this question, the

reviewing court looks to the totality of the circumstances that might "affect[ ] how a reasonable

---

[7]  In his § 2255 motion, movant argues that discovery materials ("Discovery Page
Number 989 ") provide evidence that CMS activities were conducted "with the cooperation and
under the direction of the DEA." P&A at 27. These discovery materials do not appear to be in
the court file. This unsubstantiated allegation will therefore be disregarded.

1  person in that position would perceive his or her freedom to leave."  *Id.* at 322, 325.

2      In his declaration in support of respondent's opposition to movant's motion to suppress,

3  Detective Benevides declared that prior to his interrogation of movant, he informed movant that

4  he was not under arrest and was free to leave at any time.  Dckt. No. 59, Ex. 1 at ¶10.  He did not

5  take movant into custody at the conclusion of the interview and movant was not arrested until

6  later.  *Id.*  Under these circumstances, any reasonable person would understand that he was not

7  under arrest in any sense and was free to leave.[8]  Because movant was not "in custody" during

8  his interview with Detective Benevides, his right to counsel had not yet attached.  Accordingly,

9  his Sixth Amendment claim is unavailing.

10  ### d. **Prejudice**

11      For the reasons set forth above, movant has failed to demonstrate that the motion to

12  suppress his inculpatory statements was meritorious.  However, even assuming *arguendo* that the

13  suppression motion would have prevailed had it been pursued by attorney Muhammad, movant

14  has failed to show that the result of the proceedings would have been different.  As argued by

15  respondent and described above in the factual background section, the government introduced

16  substantial evidence, aside from movant's inculpatory statements to police and CMS

17  interrogators, demonstrating that movant stole pseudoephedrine tablets from Alza knowing they

18  would be delivered to methamphetamine manufacturers.

19      Mr. Williams testified that he and movant conspired to steal pseudoephedrine from Alza,

20  which would then be provided to methamphetamine manufacturers, and that movant delivered

21  the pseudoephedrine to Williams on three separate occasions.  Dckt. No. 155 at 156-85.  Co-

22  defendant Karen Brooks supported Williams' testimony in this regard, testifying that Williams

23  told her he had obtained pseudoephedrine from someone named "Thomas," who worked at the

24  
25     [8]  Movant agreed during his cross-examination that Detective Benevides told him he was free to go, but testified that he didn't believe it.  Dckt. No. 149 at 485.  However, regardless of movant's testimony in this regard, the undersigned concludes that a reasonable person would
26  believe he was free to leave if he was specifically so informed.

1   same chemical plant where Williams used to work.  *Id.* at 152.  Michael Lawlor, an undercover

2   investigator for CMS, testified that he was present at a meeting with movant and an Alza

3   employee, who was also working as an informant, during which movant discussed the receipt

4   and movement of stolen pseudoephedrine.  Dckt. No. 149 at 356-61.  Yet another CMS

5   employee, Peyton Schur, testified that he had a telephone conversation with movant during

6   which movant stated that he had been involved with another employee in the theft of

7   pseudoephedrine.  Dckt. No. 155 at 113, 138.

8         While recognizing that a confession is "like no other evidence," and may have a

9   "profound effect on the jury," this court concludes that, under the circumstances of this case, the

10   failure of attorney Muhammad to pursue the suppression motion filed by attorney Holley did not

11   result in prejudice.  There is no reasonable probability the verdict would have been different if

12   movant's inculpatory admissions to Detective Benevides or the employees of Alza/CMS had

13   been suppressed.  Accordingly, movant is not entitled to relief on this claim.

14                   **3.  Failure to Utilize Expert Witness Testimony**

15         Movant's next claim is that his trial counsel rendered ineffective assistance in failing to

16   obtain and call an expert witness on the subject of false confessions.  P&A at 27-28.  He argues

17   that an expert could have assisted the jurors in understanding "the significance of the

18   interrogation techniques utilized by the CMS employees" and could have assisted the trial court

19   in determining the voluntariness of movant's statements to CMS and Detective Benevides.  *Id.*

20   Movant further argues that, without the assistance of an expert witness, the jury would have been

21   unable to understand that his confessions were coerced.  *Id.*  Movant states that attorney

22   Muhammad erroneously told him expert evidence on this subject was inadmissible in federal

23   ////

24   ////

25   ////

26   ////

1  court.[9]  *Id.* at 13, 28.

2        In support of this claim, movant has included the declaration of Richard A. Leo, Ph.D.,

3  J.D., Associate Professor of Criminology, Law and Society and Associate Professor of

4  Psychology and Social Behavior, at the University of California, Irvine.  Dr. Leo opines, in

5  essence, that if movant's trial testimony regarding the conduct of his interrogations was accurate,

6  his confessions were coerced.  P&A at 51, ¶ 30.  He notes, however, that even a coerced

7  confession can be true.  *Id.* ("I am not giving an opinion on whether the statements were false,

8  only as to whether the statements were coerced.  Coercion can lead to true confessions as well as

9  false confessions.").  Dr. Leo relies heavily on movant's trial testimony to support his conclusion

10  that movant's inculpatory statements to CMS and Alza employees were coerced.

11        Respondent argues that movant has failed to demonstrate prejudice with respect to this

12  claim.  This court agrees.  Dr. Leo's conclusions were not necessarily disputed at trial.

13  Respondent notes that although the government questioned movant's honesty in describing his

14  interrogations, it "never tried to suggest that, if he were truthful, the confessions were not

15  coerced."  Response at 22.  Further, Dr. Leo's opinion that even coerced confessions can be true

16  would not have been helpful to the defense theory that movant's confessions were false because

17  they had been coerced.  Because Dr. Leo could express no opinion on whether movant's trial

18  testimony was accurate or whether movant's confessions were true or false, his testimony would

19  have added nothing significant to the evidence before the jury.  In short, movant has failed to

20  demonstrate that the result of the proceedings would have been different had attorney

21  ─────────────

22        [9] Fed. R. Evid. 702 provides:

23        If scientific, technical, or other specialized knowledge will assist
          the trier of fact to understand the evidence or to determine a fact in
          issue, a witness qualified as an expert by knowledge, skill,

24        experience, training, or education, may testify thereto in the form
          of an opinion or otherwise, if (1) the testimony is based upon

25        sufficient facts or data, (2) the testimony is the product of reliable
          principles and methods, and (3) the witness has applied the

26        principles and methods reliably to the facts of the case.

1  Muhammad called an expert witness on the subject of coerced confessions.

2       Movant has also failed to establish deficient performance with respect to this claim.

3  Reasonable tactical decisions, including decisions with regard to the presentation of the case, are

4  "virtually unchallengeable." *Strickland*, 466 U.S. at 690.  "The decision whether to call any

5  witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of

6  the sort engaged in by defense attorneys in almost every trial."  *United States v. Nersesian*, 824

7  F.2d 1294, 1321 (2nd Cir. 1987).  Movant has failed to overcome the presumption that

8  Muhammad's decision not to call an expert on the subject of coerced confessions was sound trial

9  strategy and reasonable under the circumstances.  This is especially true in this case, where the

10  proposed testimony by the expert would not have had any bearing on the ultimate question of

11  whether movant's confessions were truthful.

12       Because movant has failed to demonstrate either deficient performance or prejudice, this

13  claim should be denied.

14                    **4.  Failure to Object to Prosecutorial Misconduct**

15       Movant's next claim is that attorney Muhammad rendered ineffective assistance in

16  failing to object to prosecutorial misconduct.  He argues that the prosecutor improperly forced

17  him to comment on the truthfulness of government witnesses and later compounded that error

18  during his closing argument when he criticized movant for questioning the veracity of these

19  witnesses.  P&A at 29-34.  Movant argues that Muhammad's failure to object to these instances

20  of misconduct rendered him "grossly deficient in the level of his practice."  *Id.* at 34.  He also

21  notes that Muhammad referred to the prosecutor as a "class act" and argues that this

22  compounded his mistake in failing to object to the prosecutor's improper statements.  *Id.* at 29.

23  *See also* Dckt. No. 150, at 587.

24  ////

25  ////

26  ////

17

Movant first objects to the following portions of his cross-examination involving government witness Mervin Marty:

> Q.  Okay.  Now, during this conversation with Merv Marty, did you tell Mr. Marty that you were aware that pseudoephedrine was used to make crank or meth.
>
> A.  No, that was his words.
>
> Q.  Now, basically what you're testifying to is you never made that statement.  He did?
>
> A.  He made the statement; what it was used for and wanted to know if I was aware of that.
>
> Q.  Did you tell Mr. Marty that you were aware that there were a lot of meth laboratories in the area?
>
> A.  No, that was from his knowledge.  I had no idea there was meth laboratories in the area.
>
> Q.  Now, you heard Mr. Marty testify yesterday?
>
> A.  Yes, I did.
>
> Q.  And you heard him state that you told him those two facts; correct?
>
> A.  Yes, I did.
>
> Q.  Are you, in essence, denying that you ever made those statements to him?
>
> A.  Mr. Merv Marty made those statements to me.
>
> Q.  So you're denying that you ever made them to him?
>
> A.  Correct.

Dckt. No. 149 at 444-45.

Movant also objects to the following colloquy involving government witness Mike Lawlor:

> Q.  Did you tell Mike that you would be splitting a certain amount of money, the three of you?
>
> A.  No.  Mike told me that he was gonna share an amount of money with me.

18

1    Q.  So you heard him testify this morning, he says you said that.  Is
     that incorrect?

2
     A.  Yes, I did.  Yes, I did.
3

4   *Id.* at 451.

5        Movant further objects to the following cross-examination regarding government witness

6   Peyton Schur:

7    Q.  You heard Mr. Schur's testimony yesterday as to the nature of
     that conversation?
8
     A.  Oh, yes, I did hear Mr. Schur's testimony yesterday.
9
     Q.  And he also is not correct in his testimony?
10
     A.  Mr. Schur, I don't even want to talk about Mr. Schur, but he is
11   definitely incorrect.

12  *Id.* at 456.

13   Q.  So he told you he was a private investigator, but he could have
     you arrested, and he could have your house raided as a private
14   investigator?

15   A.  I don't know the law.  All I know is that when I tried to leave
     on the 15th and I was arrested, I didn't believe anything Peyton
16   Schur said at that time.

17   Q.  You heard Mr. Schur testify yesterday where he denied treating
     you in any fashion like this; correct?
18
     A.  If Peyton Schur had got up here and told the truth about how he
19   did to me, I don't think anybody would have believed that.

20   Q.  So basically you're indicating that Mr. Schur was incorrect
     yesterday when he testified?
21
     A.  I believe Mr. Peyton Schur shouldn't have no license to
22   operate.

23   Q.  That's not what I asked.

24   A.  Okay.

25   Q.  He was incorrect?

26   A.  Yes, definitely.

*Id.* at 464.

Finally, movant objects to the following cross-examination involving government witness Detective Benevides:

> Q.  The next day you met with Detective Benevides at the police department; is that correct?
>
> A.  Yes.
>
> Q.  And you indicated when you were questioned by Mr. Muhammad that you asked Detective Benevides, before he interviewed you, if you needed a lawyer.
>
> A.  Correct.
>
> Q  Why did you ask him that?
>
> A.  Because something about Detective Benevides didn't look right to me.
>
> Q.  Just did not look trustworthy?
>
> A.  Correct.
>
> Q.  And you heard Detective Benevides testify yesterday where he certainly recalled nothing of that nature.  Is he mistaken?
>
> A.  Detective Benevides is a liar.

*Id.* at 483.

Movant argues that the prosecutor's improper questioning was compounded by the following portions of his closing statement:

> Let's look briefly at what the defendant has had to say about this evidence, about the overwhelming case that has been put on against him.  And it's just clear that this case is very strong.  And the defendant has tried to combat it by telling you that virtually everybody who has testified against him has come into court, taken the oath, sat on that witness stand, and lied to you.
>
> He directly called Detective Benevides a liar.  He used those words.  I don't believe he used those exact words for the others, but it was very clear that he was calling Peyton Schur a liar, Richard Vincent a liar, Derrick Williams lied.  To a lesser extent, Mike Lawlor.

Dckt. No. 150 at 555.

In essence, if you take everything the defendant has said and not just look at a witness by witness, he's actually claiming that either these individuals have each made an individual decision to all do the same thing, and that is come into court and lie to you, or that they've gotten together and done it collectively, and that there is this vast conspiracy involving a half a dozen people to lie just to get him, Thomas Ross. But what makes it so galling is that this is a conspiracy to get or to frame an innocent man.

*Id.* at 556-57.

Now, the defendant wants you to believe that despite their concern, despite their effort, despite the expense they incurred, they didn't care about getting the right people. They wanted him. For what reason? I don't know. We never heard it. But they wanted him. The person who was actually doing it may have been working right next to Mr. Ross, but they didn't care. They wanted him. And I would submit to you that that is ridiculous.

If you believe the defendant for one second, then you have to automatically believe that each and every one of these witnesses who came into court lied and perjured themselves to you under oath. There is not a way in this world that you can accept the defendant's story unless you find that all of these people have lied. And they not only lied, they lied under oath. If these men are telling the truth, then there's no way the defendant could be.

*Id.* at 557-58.[10]

////

////

////

////

////

////

////

////

---

[10]  The prosecutor continued:

Mr. Ross wants you to believe him, wants you to believe that these men have, again, either individually all made the same decision to get him or have gotten together and conspired to get him by committing perjury."

*Id.* at 558.

> It is easy to criticize someone's credibility.  It is easy to even refer to them as coining shenanigans or calling him clowns.  That's not hard to do.  What's much harder is supporting those kinds of accusations after a careful and impartial examination of all the evidence.
>
> And in assessing this case, I would submit to you that it's very easy for Mr. Ross or anyone to come in and state these things never happened, these people are lying.

*Id.* at 599.[11]

Movant argues that the prosecutor's "scheme" to force him to testify that the government witnesses were not telling the truth and then attack movant for doing so during closing argument was "markedly unfair" and should have been challenged by attorney Muhammad.  P&A at 32. He also claims the prosecutor's actions constituted improper vouching.  *Id.* at 34.

"It's black letter law that a prosecutor may not ask a defendant to comment on the truthfulness of another witness."  *United States v. Harrison*, 585 F.3d 1155, 1158 (9th Cir. 2009).  This is because "it is the jurors' responsibility to determine credibility by assessing the witnesses and witness testimony in light of their own experience."  *United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998).  Asking one witness whether another witness is lying infringes on the jury's exclusive role as arbiter of witness credibility.  *Id.*  Therefore, in *Harrison*, it was improper for the prosecutor to ask:  "You're saying that [they're] going on the stand, swearing an oath to testify to the truth and then lying . . . ?")  585 F.3d at 1158.  In *United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004), the prosecutor committed misconduct when he asked the defendant whether a government agent "was lying."  In *United States v. Geston*, 299 F.3d 1130, 1136 (9th Cir. 2002), the prosecutor improperly asked two defense witnesses whether

---

[11]  The prosecutor continued:

> look at all of the evidence.  And if you need to, listen to, view the tapes.  And determine if Mr. Ross has made this up because it's in his interest to do so, or determine whether all of these other individuals have perjured themselves in this court."

*Id.* at 599-600.

other law enforcement witnesses were lying and asked one of them about the veracity of five other government witnesses.  In *United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir. 1999), the Ninth Circuit held it was error "for a prosecutor to force a defendant to call a [testifying government agent] a liar."  In *United States v. Sullivan*, 85 F.3d 743, 749-50 (1st Cir. 1996), the First Circuit opined that "counsel should not ask one witness to comment on the veracity of the testimony of another witness."  In *United States v. Boyd*, 54 F.3d 868, 871 (D.C.Cir. 1995), the D.C. Circuit concluded it was "error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand."  And in *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987), the prosecutor was guilty of misconduct when he forced the defendant to testify that an FBI agent was either mistaken or lying.[12]

The prosecutor's cross-examination questions to movant, set forth above, were clearly designed to compel movant to comment on the truthfulness of government witnesses and were therefore improper pursuant to the cases cited above.  In the most egregious instance, the prosecutor induced movant to testify that Detective Benevides was "a liar."  In addition, the prosecutor argued in closing that movant had tried to defend the case against him by "telling you that virtually everybody who has testified against him has come into court, taken the oath, sat on that witness stand, and lied to you."  Dckt. No. 50 at 555.  He further argued that movant had "directly called Detective Benevides a liar" and that "it was very clear that he was calling Peyton Schur a liar, Richard Vincent a liar, Derrick Williams lied . . . to a lesser extent, Mike Lawlor."  *Id.*  These arguments were designed to highlight the improper cross-examination questions set forth above, and were also improper.  As such, attorney Mohammad was deficient in failing to object to these cross-examination questions and the related closing argument.  *See Harrison*, 585

---

[12]  *Cf. United States v. Wright*, No. 08-10525, 2010 WL 4345670, at *23 (9th Cir. July 12, 2010) (prosecutor did not commit misconduct when he forced the defendant to call government witness a "rogue agent" because, unlike the situation in *Combs*, he did not explicitly force the defendant to impugn the veracity of the agent's testimony).

1   F.3d at 1159 (defense attorney "should have objected as soon as he saw the prosecutors step out

2   of line.").

3          Other challenged portions of the prosecutor's closing argument may have constituted

4   improper vouching.[13]  In *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005),

5   the Ninth Circuit found improper vouching where the prosecutor told the jury, among other

6   things, that government witnesses "had no reason to come in here and not tell you the truth," and

7   that in order to believe defendant's story they would also have to believe that government

8   witnesses had lied to the court, thereby committing perjury.  In *Combs*, the prosecutor

9   impermissibly vouched for the testimony of a government witness where he "plainly implied that

10  she knew [an agent] would be fired for committing perjury and that she believed no reasonable

11  agent in his shoes would take such a risk"  379 F.3d at 575.  In *Sanchez*, the court noted that

12  "prosecutors have been admonished time and again to avoid statements to the effect that, if the

13  defendant is innocent, government agents must be lying."  176 F.3d at 1224 (quoting *Richter*,

14  826 F.2d at 209).  In *Richter,* the court noted it was improper to argue that in order to acquit the

15  defendant, the jury would have to find that government officers committed perjury.  826 F.2d at

16  209-10.

17         It is also true, however, that "the prosecution must have reasonable latitude to fashion

18  closing arguments" and may "argue reasonable inferences based on the evidence."  *United States*

19  *v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  In a case "that essentially reduces to which of

20  two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the

21  two sides is lying."  *Id.  See also Dubria v. Smith*, 224 F.3d 995, 1004 (9th Cir. 2000) ("a

22  prosecutor is free to voice doubt about the veracity of a defendant's story").

23  ////

---

25  [13]  "The government may not vouch for the credibility of its witnesses, either by putting
its own prestige behind the witness, or by indicating that extrinsic information not presented in
court supports the witness' testimony."  *United States v. Inzunza*, 580 F.3d 894, 910 (9th Cir.
26  2009) (quoting *United States v. Simtob*, 901 F.2d 799, 805 (9th Cir. 1990)).

1    In this case, the prosecutor argued that it was impossible to believe movant's version of

2    the events unless the jury concluded the government witnesses had "lied."  Dckt. No. 150 at 558.

3    It is true that, under the circumstances of this case, the inference is unavoidable that either

4    movant or a number of government witnesses who testified against him were lying.  The

5    prosecutor's argument to this effect appears to be a permissible inference from the evidence.  On

6    the other hand, the prosecutor also argued that, in order to believe movant's side of the story, the

7    jury would have to believe that government witnesses, including Detective Benevides, were

8    "perjur[ing] themselves to you under oath."  *Id.*  These statements arguably border on improper

9    vouching under the cases cited above.

10    Assuming *arguendo* that the prosecutor committed misconduct, any error was harmless

11    under the circumstances of this case.  In *Harrison*, the prosecutor's improper attempts to force

12    the defendant to comment on the veracity of government witnesses "was an organizational theme

13    for the prosecutor's entire cross-examination."  585 F.3d at 1159.  The *Harrison* dissent

14    "counted at least twenty-six separate questions of this nature."  *Id.* at 1163 (Bybee, J.,

15    dissenting).  However, despite the widespread misconduct at issue in *Harrison*, the court

16    affirmed the defendant's conviction.  The court concluded that the misconduct was not

17    prejudicial because there was physical evidence of defendant's guilt aside from the testimony of

18    the government witnesses, four witnesses undermined the petitioner's credibility, and the court

19    provided the jury with a curative instruction.  *Id.* at 1159.

20    In *Combs*, the prosecutor committed misconduct when he asked the defendant whether a

21    government agent was "making up" his testimony or "lying."  379 F.3d at 567.  When the trial

22    judge intervened to prod the defendant to answer these questions, defendant testified that the

23    agent "lied."  *Id.*  During his closing argument, the prosecutor made the following arguments:

24    

25        The defendant claims Special Agent Bailey is lying.  Ask
    yourselves, ladies and gentlemen, who has the motive to lie here,
    the defendant or Special Agent Bailey-Special Agent Bailey will

26        get up and go to work on Monday as he has done for the past ten

> years regardless of the outcome of this case-or the defendant who
> is facing two felony charges?
>
> * * *
>
> Most of all, ladies and gentlemen, you have to believe that Special
> Agent Kent Bailey is a liar.  If you believe the defendant's version
> of events, you have to believe that Special Agent Kent Bailey
> walked up to that witness stand, swore to tell you the truth, and
> perjured himself.

*Id.* at 567-68.  The Ninth Circuit concluded that the prosecutor's cross-examination questions

were improper and that his closing argument constituted improper vouching because it implied

that Agent Bailey would have been fired if she committed perjury.  The court also concluded the

errors were prejudicial, noting that there was no curative jury instruction regarding the improper

vouching and the case consisted of a credibility contest between the defendant and two

witnesses, and was therefore "close."  379 F.3d at 575-76.  Because witness credibility was

paramount in that case and agent Bailey's testimony was possibly determinative, it was

"fundamentally unfair to compel Combs to impugn the veracity of agent Bailey's testimony,

pitting Combs's credibility against agent Bailey's."  *Id.*

In *Geston*, the prosecutor asked two defense witnesses whether other law enforcement

witnesses were lying and asked one of them about the veracity of five other government

witnesses.  The court held that the prosecutor's questions were improper because "they

compelled [the two witnesses] to offer opinions regarding the veracity of the government

witnesses."  299 F.3d at 1136.  The court also concluded that the misconduct was prejudicial,

noting that a prior trial against the defendant had resulted in a hung jury and the case was close.

*Id.*

In *United States v. Richter*, the Second Circuit found that cross-examination compelling a

defendant to state that law enforcement officers lied in their testimony was improper.  826 F.2d

at 208.  Compounding this error was the prosecutor's closing argument, as follows:

////

1    Members of the Jury, there is another compelling reason why Mr. Richter's
      testimony on that stand is unworthy of your belief, and that is because it's
2    completely inconsistent with his direct testimony on not one but two FBI agents.

3    You heard Mr. Richter on the witness stand.  I asked him time and time again,
      isn't it a fact, sir, isn't it a fact that you admitted to the FBI that when Mr. Von
4    Braunsberg gave you these checks he told you that he had taken them from the
      bank, and he said No, I never said that to them.  Then they are mistaken or lying.
5    Over and over again, the agents are lying to get me.  That's what Mr. Richter
      wants you to believe.  And ask yourselves why.  Why would two agents of the
6    FBI, with some 30 to 40 years of experience between them, come into this
      courtroom and commit perjury and risk their careers to get Mr. James Richter?
7    Why would they do that?

8    So, members of the Jury, I submit that you can determine that Mr. Richter is not
      telling you the truth because if he is, then these two agents, over and over again,
9    in this courtroom, committed perjury.

10   *Id.* at 209.  The Second Circuit reversed the defendant's conviction, finding that the prosecutor's

11   improper cross-examination questions and closing argument, coupled with the fact that the

12   prosecutor called a rebuttal witness to corroborate testimony that the defendant had labelled as

13   false, was "so prejudicial as to require the granting of a new trial."  *Id.*

14          Here, there were four separate instances of improper questioning in a somewhat lengthy

15   cross-examination.  Unlike the situation in *Harrison*, it cannot be said that these questions

16   constituted an "organizational theme for the prosecutor's entire cross-examination."  Nor was

17   this case merely a credibility contest, as in *Combs*, or an extremely close case, as in *Geston*.

18   There was significant evidence of movant's guilt presented at trial.  As described above, that

19   evidence consisted of movant's confessions and admissions and the testimony of Williams,

20   Brooks and Lawlor which supported those confessions.  Under the circumstances of this case,

21   the prosecutor's improper comment and argument was not so flagrant or material as to prejudice

22   the defense.

23          Movant has failed to show a reasonable probability that, but for attorney Muhammad's

24   failure to object to the prosecutor's improper questions and argument, the result of the

25   proceeding would have been different.  *Strickland*, 466 U.S. at 694.  Counsel's failure to object

26   does not "undermine confidence in the outcome" of this case.  *Id.*  Accordingly, movant is not

27

1  entitled to relief on this claim.

2       **5. Plea Negotiations**

3       Movant argues that attorney Muhammad rendered ineffective assistance by persuading

4  him not to enter into plea negotiations.  According to movant, Muhammad told him plea

5  negotiations would be "useless." P&A at 34.  He states, "given Muhammad's need for

6  petitioner's legal fee, it would be reasonable to conclude that Muhammad was dissuading

7  petitioner from taking a plea to aid himself financially." *Id.*  Movant also notes that at the

8  sentencing proceedings, the trial judge commented that "if [movant] were not so stubborn and if

9  he had had possibly a different attorney than Mr. Muhammad, he might have been able to avail

10  himself of a plea agreement that would have yielded a sentence more consistent with that

11  imposed on the other defendants." *Id.* at 35.

12       In opposition to this claim, respondent has filed the declaration of the prosecutor,

13  Kenneth J. Melikian.  Mr. Melikian declares that he entered into extensive plea negotiations with

14  movant's first attorney, Mr. Holley, which culminated in an offer that was "extremely

15  beneficial" to movant.  Declaration of Kenneth J. Melikian, filed March 9, 2007, at 3.  He states

16  that movant rejected this offer even though Mr. Holley strongly recommended that he accept it.

17  *Id.* at 1-3.  Mr. Melikian further declares that, while he does not recall participating in plea

18  negotiations with attorney Muhammad, he was not surprised at this because "Mr. Holley had

19  emphatically informed me that, contrary to Mr. Holley's recommendations, [movant] was not

20  interested in seeking a negotiated settlement of his case." *Id.* at 2.  Mr. Melikian also declares

21  that, after the verdict, when he became aware that attorney Muhammad had been suspended by

22  the California State Bar prior to movant's trial, the government offered to settle movant's case

23  for "far less than the 20 years mandated by the Guidelines." *Id.* at 3.  However, movant declined

24  this offer also, through his then attorney, Donald Frick.  *Id.*  Respondent argues, "the sole party

25  who is responsible for the failure of plea negotiations in this case is the defendant himself." *Id.*

26  at 4.

28

1      Movant has filed his own declaration in support of this claim.  Therein, he declares that

2   when attorney Holley recommended he accept the government's plea offer, he was "terrified"

3   and sought a second opinion from Mr. Muhammad.  Declaration of Thomas Raymond Ross in

4   Support of His Reply, at 2.  Attorney Muhammad told him "the plea bargain was meaningless"

5   and that "the only way out was to go to trial."  *Id.*  After movant was convicted, he received the

6   government's new plea offer but declined to accept it.  He explains:

7              I asked [movant's then attorney, Mr. Frick] what I should do and
             he was very noncommittal.  He would say that the offer was less
8              than what I could get but also say that I had a very strong appeal
             issue because Mr. Muhammad was suspended during the time he
9              represented me.  Maybe it was wishful thinking on my part, but he
             seemed so assured about the strength of the appeal that I decided to
10             go forward with the appeal.  I was not hard-headed, only afraid.

11  *Id.* at 2-3.

12      After a review of the record, the undersigned concludes that movant has failed to

13  demonstrate prejudice with respect to this claim.  There is no evidence before the court that

14  movant would have accepted the government's plea offer even if attorney Muhammad had

15  recommended that he accept it.  Movant rejected both of the government's plea offers, even after

16  he had been convicted.  There is no evidence movant was willing to accept a plea offer at any

17  point in these proceedings or that attorney Muhammad believed he was.  In short, movant has

18  failed to demonstrate that the result of the proceedings would have been different if Mr.

19  Muhammad had recommended that movant enter into plea negotiations.  Accordingly, this claim

20  must be denied.

21              **6. <u>Miscellaneous Failures</u>**

22      Movant claims, in a general fashion, that attorney Muhammad's "major failures" were

23  compounded by a "laundry list of errors and omissions."  P&A at 35.  Those omissions include

24  "failing to call witnesses from Alza such as Antoinette Johnson, calling petitioner's mother to

25  the stand when her testimony was *entirely* adverse to petitioner's cause, failing to adequately

26  prepare petitioner for testimony by instructing him to downplay the level of CMS coercion,

failing to move for a judgment of acquittal, thus raising the standard of proof on appeal, failing to move for a new trial because of complete abandonment of counsel, and failing to object to erroneous jury instructions." *Id.  See also* P&A at 17, 20-21.  He argues that "the totality" of Muhammad's representation constitutes ineffective assistance.  *Id.* at 35.

Movant has failed to demonstrate either deficient performance or prejudice with respect to these vague and conclusory claims.  *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'") (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).[14]  Movant has not overcome the strong presumption that attorney Muhammad's performance with respect to the decisions listed above was outside the wide range of professional assistance.  Nor do counsel's alleged failures undermine confidence in the outcome of this trial.  Accordingly, movant is not entitled to relief on these claims.

### 7.  **Appellate Counsel**

Movant claims that his appellate counsel rendered ineffective assistance in failing to raise a claim of prosecutorial misconduct.  P&A at 34.

The *Strickland* standards apply to appellate counsel as well as trial counsel.  *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  *Id*.  Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined."  *Id.  See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and

---

[14]  Movant's claim with respect to counsel's failure to object to an erroneous jury instruction appears to have been raised and denied on appeal.  *Ross*, 388 F.3d at 1057-58.

1   is not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

2   meritless arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a

3   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

4   to raise a weak issue.  *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this

5   context, movant must demonstrate that, but for counsel's errors, he probably would have

6   prevailed on appeal.  *Id.* at 1434 n.9.

7          For the reasons described above, movant has failed to demonstrate a reasonable

8   probability that this issue would have prevailed on appeal.  *Id.*  Accordingly, he is not entitled to

9   relief on this claim.

10         **B.  Other Claims**

11         In addition to his ineffective assistance of counsel claims, movant alleges that his

12   conviction was based on coerced confessions to the police and to employees of CMS and Alza;

13   his conviction was based on statements obtained in violation of the *Miranda* rule; his conviction

14   was based on prosecutorial misconduct; and his sentence violates his Sixth Amendment rights as

15   set forth in *United States v. Booker*, 543 U.S. 220 (2005).  P&A at 35-38.  These claims were not

16   raised on appeal.  Respondent argues that, under these circumstances, movant's additional claims

17   are not cognizable in the instant motion.  Response at 10-11.

18         A collateral challenge is not a substitute for an appeal.  *United States v. Frady*, 456 U.S.

19   152, 168 (1982).  "Where a defendant has procedurally defaulted a claim by failing to raise it on

20   direct review, the claim may be raised in habeas only if the defendant can first demonstrate

21   either "cause" and actual "prejudice," or that he is "actually innocent."  *Bousley v. United States*,

22   523 U.S. 614, 622 (1998) (citations omitted).  "Ineffective assistance of counsel constitutes

23   'cause' for failure to raise a challenge prior to section 2255 collateral review."  *United States v.*

24   *De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993).  For this reason, movant's claims of ineffective

25   assistance of counsel are cognizable in this § 2255 motion.

26   ////

Movant's other claims, described above, were not raised on direct appeal and have therefore been waived.  Even if they had not been waived, they lack merit and should be denied. For the reasons set forth above, movant's claims that his inculpatory statements were obtained in violation of his constitutional rights and his claim that the prosecutor committed prejudicial misconduct lack merit.

Movant's claim based on *United States v. Booker* is also unavailing.  In *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004), the United States Supreme Court held that a defendant in a criminal case is entitled to have a jury determine beyond a reasonable doubt any fact that increases the statutory maximum sentence, unless the fact was admitted by the defendant or was based on a prior conviction.  In *Booker*, the United States Supreme Court applied *Blakely* to the Federal Sentencing Guidelines and held that the Guidelines are advisory and not mandatory.  543 U.S. at 303-04.

Movant argues that his sentence is illegal under *Booker* because he was sentenced without a jury finding as to the elements used to determine the length of his incarceration.  P&A at 36-38.[15]  However, movant was sentenced and his conviction became final prior to the date of the *Booker* decision.  *Booker* is not retroactive and does not apply to cases on collateral review where the conviction was final as of the date of *Booker*'s publication.  *United States v. Cruz*, 423 F.3d 1119 (9th Cir. 2005).  Accordingly, movant's claim based on the *Booker* decision must be denied.[16]

---

[15]  Specifically, he argues that "the Second Amended Presentence Report prepared for Ross set the Base Offense Level for his offenses at Level 38 with an additional two levels recommended for Obstruction of Justice.  Neither of these determinations had been based on findings of fact by a jury."  P&A at 21.

[16]  Movant acknowledges that *Booker* is not retroactive, but he argues that he should be re-sentenced in the interests of justice.  Traverse at 13-14.  *See United States v. Labrada-Bustamante*, 428 F.3d 1252, 1262 (9th Cir. 2005) (re-sentencing is appropriate where a reviewing court can reliably determine from the record that the sentence imposed would have differed materially if the sentencing court had known that the Sentencing Guidelines were only advisory); *United States v. Crawford*, 422 F.3d 1145, 1146 (9th Cir. 2005) (same).  Movant

### C. Evidentiary Hearing

The court concludes that an evidentiary hearing is not necessary in order to decide movant's claims. *See Shah v. United States*, 878 F.2d 1156, 1160 (9th Cir. 1989); *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988). The record before the court permits "'careful consideration and plenary processing,'" of movant's factual allegations, *Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977), and conclusively shows that movant is not entitled to relief on his claim of ineffective assistance of trial counsel.

## V. Conclusion

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1. Movant's January 22, 2005 motion to vacate, set aside, or correct his plea and sentence pursuant to 28 U.S.C. § 2255 be denied; and

2. The Clerk be directed to close the companion civil case No. CIV S-05-0167 WBS EFB P.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v.*

---

notes that his co-defendants received significantly lower sentences than he did. He also notes that the trial judge commented in strong terms on this unfairness at the sentencing proceedings and indicated he would have imposed a shorter sentence if he were not bound by the Sentencing Guidelines. *Id.* at 14; P&A at 37-59. *See also* Dckt. No. 188 at 6-7, 8. Movant points out that *Blakely*, which foreshadowed the holding in *Booker*, was issued only two months after movant's judgment had become final. These arguments are persuasive. It appears from the record of the sentencing proceedings that the trial judge would have sentenced movant to a lower term if he had not believed he was constrained by the Sentencing Guidelines. However, a decision whether to re-sentence movant in the interests of justice must be left to the discretion of the trial judge in this matter or to the Ninth Circuit on any appeal of the decision on the instant motion. *See Dillon v. Smith*, No. 1:07-CV-00118 AWI SMS HC, 2007 WL 781455 (E.D. Cal. March 13, 2007).

*Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections movant may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:   March 30, 2011.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE